[No. A127186. First Dist., Div. One. Apr. 27, 2011.]

FORT BRAGG UNIFIED SCHOOL DISTRICT, Plaintiff and Respondent, v. COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, Defendant and Appellant.

[No. A127189. First Dist., Div. One. Apr. 27, 2011.]

FORT BRAGG UNIFIED SCHOOL DISTRICT, Plaintiff and Respondent, v. SOLANO COUNTY ROOFING, INC., Defendant and Appellant.

[No. A127244. First Dist., Div. One. Apr. 27, 2011.]

SOLANO COUNTY ROOFING, INC., Cross-complainant and Respondent, v. STERLING ENVIRONMENTAL CORPORATION, Cross-defendant and Appellant.

892

**COUNSEL**

Sedgwick, Detert, Moran & Arnold, Marilyn Klinger, James P. Diwik and Joel M. Long for Defendant and Appellant Colonial American Casualty and Surety Company.

The Law Offices of Adrienne D. Cohen, Adrienne D. Cohen, Kimberly J. Sarni and Elizabeth T. Evans for Defendant and Appellant and for Cross-complainant and Respondent Solano County Roofing, Inc.

Bishop, Barry, Drath, Jonathan Gross, Colin Adkins and Sheila T. Addiego for Cross-defendant and Appellant.

Stubbs & Leone and Gregory E. Stubbs for Plaintiff and Respondent.

## OPINION

**MARGULIES, J.**—This action was brought by the Fort Bragg Unified School District (District) on behalf of two public agency self-insured risk pools that funded repairs to a District elementary school damaged by rain. The suit sought reimbursement of the repair costs from two contractors and a performance bond surety arising from the contractors' failure to properly secure the school while replacing portions of its roof. One of the contractor defendants, Solano County Roofing, Inc. (Solano), cross-complained against the second contractor, Sterling Environmental Corporation (Sterling).

Solano and its surety, Colonial American Casualty and Surety Company (Colonial), appeal on multiple grounds from a judgment on the complaint in favor of the District. Sterling appeals from an adverse judgment on Solano's cross-complaint. We reverse the District's judgment and award of prejudgment interest against Solano, affirm its judgment and interest award against Colonial, and vacate as moot the judgment on Solano's cross-complaint against Sterling.

## I. BACKGROUND

### A. *The Redwood Elementary School Modernization Project*

The District began a two-stage modernization project at Redwood Elementary School in 1998. In the first phase, contractors completely renovated the school's interior, including painting, carpeting, and installation of new telephone and computer systems. All planned interior renovations and remodeling were completed by the fall of 2000 at a cost in excess of $2.4 million. In the second phase of the modernization, the District contracted with Solano to reroof the school. This required removal of the existing built-up roof membrane from the wooden roof deck structure and then attaching a new underlayment followed by a new metal roof. During phase I, the District contracted with Sterling to perform asbestos abatement work for the whole modernization project, including the removal in phase II of part of the roof membrane that contained asbestos. Solano's responsibilities in phase II included removing portions of the old roof membrane that did not contain asbestos, and reroofing the entire building.

## B. *Breaches of Contractual Covenants and Damages*

The District's contract with Sterling required Sterling to continuously maintain adequate protection of all of its work, protect the District's property from injury or loss arising from the contract, and hold the District harmless from any such damage, injury, or loss. Sterling was specifically required to make sure the roofing asbestos area was "not left uncovered at any time due to the possibility of rain or moisture entering the building."

Solano's contract contained numerous provisions requiring it to protect its work and the District's property from rain or moisture damage. Under the contract, Solano was required, among other things, to bear all costs for "replacement of damage to existing or new construction from weather effects," "[r]estore any improvements damaged by this work to their original condition," and repair or replace all existing finished work "damaged by operations under this contract . . . at no extra cost to the Owner." Solano also bore overall responsibility to coordinate its work with Sterling's, keep track of all of Sterling's activities, and ensure the entire structure was adequately covered at all times, both in the areas it was working on and those Sterling worked on. The contract also required Solano to obtain a bond in an amount at least equal to the base price of the contract "to guarantee the faithful performance of the Contract."

The phase II roof work began on Monday, June 18, 2001. Water penetration into the interior of the school—caused by three days of rain beginning on Monday, June 25, 2001—resulted in $389,968 of damage to the interior of the school. The trial court found the damage was proximately caused by Sterling's and Solano's breaches of their contractual covenants with the District to maintain the integrity of the school's roof covering against rain and moisture, and prevent damage to its interior, during the performance of their work.

## C. *Coverage of the Loss*

The costs of repairing the rain damage to Redwood Elementary School were ultimately paid by three entities: the Northern California Schools Insurance Group (NCSIG) ($96,131.16), Northern California Regional Liability Excess Fund Joint Powers Authority (NCR) ($150,000), and Insurance Company of the West (ICW) ($150,493.45).[1] NCSIG is a joint powers authority formed pursuant to Government Code sections 990.4 and 990.8, for the purpose of pooling the "self-insured claims and losses" of a group of

---

[1] The total sum contributed by the three entities—$396,624.61—was based on the estimated cost of repairs. The actual cost of repair, as found by the trial court, turned out to be slightly less, $389,968.

member school districts in Northern California. NCSIG is a member of NCR, which is also a joint powers authority formed to pool self-insured claims and losses of member "[p]ublic educational agencies" pursuant to sections 990.4 and 990.8.[2] The District paid NCSIG an annual contribution payment, and was afforded primary coverage for property damage up to the first $100,000 of loss after a $1,000 deductible. NCR provided secondary coverage up to $150,000 for any given loss. ICW, a private insurer, provided $10 million of reinsurance to NCR for payments by NCR in excess of its $150,000 limit.

The annual pool contribution for each public entity participating in NCSIG and NCR (collectively, the JPA's) is calculated pursuant to NCR's bylaws. The bylaws provide that each member must pay an annual base contribution rate based upon, among other information, the member's prior year average daily attendance, loss history, unusual exposures, and total insured values. The base rate could be modified based on a member's claims experience according to methodology calculated by an actuary or consultant approved by the NCR's underwriting committee. The bylaws further provided: "Any Subrogation recoveries received by [NCR], or its Members, shall be credited to the amounts paid by the Authority for the Member, with the remainder, if any, remitted to the Member . . . ." Although considered the "property" of NCR, subrogation monies received are credited to the member's account for purposes of computing the member's annual contribution to the costs of the pool.

The application of the District's primary and excess coverage were also governed by a memorandum spelling out the scope of claims and losses covered and the rights and duties of the members and NCR with respect to claims. That memorandum states: "The Memorandum of Coverage is not an insurance policy. [NCR] is not a commercial insurer, nor is it subject to regulation under the California Insurance Code. (Gov. Code § 990.8(c); *City of South El Monte v. Southern California Joint Powers Insurance Authority* (1995) 38 Cal.App.4th 1629 [45 Cal.Rptr.2d 729].)" The memorandum further provided: "In the event of any payment under this Memorandum, [NCR] shall be subrogated to all the rights of recovery against any person or organization . . . ."

D. *Surety and Insurance Parties*

Colonial issued a performance bond on Solano's behalf in the amount of $713,999 in connection with its phase II work on Redwood Elementary School. Solano maintained a $1 million liability insurance policy with

---

[2] According to NCR's bylaws, "[p]ublic educational agencies" include, among other entities, public school districts, community college districts, and county boards of education, as well as joint powers agencies comprised of such entities.

Villanova Insurance Company (Villanova) for the policy period of January 1, 2001 to January 29, 2002. On July 25, 2003, Villanova was declared insolvent and ordered into liquidation. As a result of the liquidation, the California Insurance Guarantee Association (CIGA) assumed the administration of claims made in California against Villanova's insureds pursuant to Insurance Code section 1063 et seq. (the Guarantee Act).[3]

Sterling maintained a $2 million liability insurance policy with Zurich American Insurance Company (Zurich) during the relevant policy period.

## E. *The District's Subrogation Action*

The District filed this action in April 2004, asserting causes of action for breach of contract and negligence against Solano, Sterling, and Colonial. Solano and Colonial cross-complained against Sterling for indemnity, contribution, and declaratory relief.

Solano moved for summary judgment in November 2005, asserting all of the District's claims against it were barred under Insurance Code section 1063.1, subdivision (c)(5) (hereafter subdivision (c)(5)), since (1) Villanova was insolvent; (2) CIGA was handling the District's claims against Solano; and (3) the District's insurers—NCSIG, NCR, and ICW—were bringing the complaint as a subrogation action for reimbursement on the amounts they had paid to the District.[4] In opposition to the motion, the District did not dispute Solano's characterization of its claims as subrogation claims brought on behalf of the JPA's, but denied these entities could be considered "insurers" or "insurance pools" for purposes of the Guarantee Act. The District's opposition did not address whether ICW was entitled to maintain a subrogation claim against Solano under the Guarantee Act.

The motion was heard by Judge Richard J. Henderson, who denied Solano's motion in part. The court accepted the premise of Solano's motion

---

[3] " 'CIGA is an involuntary, unincorporated association of insurers admitted to transact business in California. Each insurer is required to participate in CIGA as a condition of doing business in this state. The statutory purpose of CIGA is to provide for each insurer member insolvency insurance to pay the claims arising out of policies issued by an [insurer who becomes insolvent]. . . . Funds for the payment of such claims are obtained by collecting premium payments from its members. . . . CIGA is limited to the payment of "covered claims" [as statutorily prescribed in Insurance Code section 1063.1] . . . .' " (*Isaacson v. California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 786 [244 Cal.Rptr. 655, 750 P.2d 297], quoting *In re Imperial Ins. Co.* (1984) 157 Cal.App.3d 290, 293 [203 Cal.Rptr. 664].)

[4] With exceptions not relevant here, subdivision (c)(5) bars "insurers" and "insurance pools" from bringing subrogation actions against the insureds of insolvent carriers: "An insurer, insurance pool, or underwriting association may not maintain, in its own name or in the name of its insured, a claim or legal action against the insured of the insolvent insurer for contribution, indemnity or by way of subrogation . . . ." (Subd. (c)(5).)

that the District's causes of action were based on subrogation, twice using that label to describe them in its written order. With respect to the District's subrogation claims on behalf of the JPA's, the court held these claims were not barred under the Guarantee Act because these entities were not insurers or insurance pools. With regard to ICW only, the court held the District could not seek recovery of its payment of $150,493.45 from Solano or CIGA under subdivision (c)(5), since there was no evidence ICW was anything other than a solvent insurer.[5]

The District's claims proceeded to an eight-day bench trial before Judge Leonard J. LaCasse. Pursuant to an earlier off-the-record discussion, the parties agreed Judge Henderson's ruling that the JPA's were not insurance companies or insurance pools under the Guarantee Act would be treated as the law of the case for purposes of the trial, without prejudice to Solano challenging that ruling on appeal. The trial on the District's claims was followed by a half-day trial on Solano's and Colonial's cross-complaints against Sterling.

F. *Statement of Decision and Judgment*

Following lengthy posttrial proceedings, the trial court found in favor of the District on its breach of contract and negligence claims against Solano and Sterling, but sharply limited Solano's exposure to damages based on the court's interpretation of provisions of the Guarantee Act.[6] Based on a detailed and comprehensive statement of decision, the court found Solano (and Colonial, as discussed below) jointly and severally liable for the full amount ($389,968) of the District's damages. In reliance on Judge Henderson's summary judgment ruling, the court found that $150,493.45 of that amount— the amount funded by private reinsurer ICW—would not be enforceable *against Solano.*

Solano's exposure was further reduced by the court's findings with respect to Sterling's liability. Sterling was found to be jointly and severally liable along with Solano and Colonial for $252,800 of the $389,968 in damages incurred by the District. The lesser figure for Sterling's joint and several liability was based on the limited portions of the school's roof Sterling was working on—and for which it therefore shared responsibility with Solano—

[5] ICW had not made any direct payment to the District. It paid NCR's reinsurance claim of $150,493.45 for payments NCR made to the District that were over NCR's $150,000 coverage limit.

[6] It was implicit in all of the court's rulings with respect to Solano that CIGA, stepping into the shoes of Solano's insolvent liability insurer, would ultimately be responsible for satisfying any monetary judgment rendered against Solano, subject to the terms and limitations of Solano's liability insurance policy. (See Ins. Code, § 1063.2, subd. (a).)

when the rain damage occurred. However, the court found on Solano's cross-complaint against Sterling that *Sterling rather than Solano* must satisfy the $252,800 portion of the judgment for which it was jointly and severally liable with Solano. Construing the Guarantee Act, the court reasoned Sterling must pay ahead of Solano because the latter's insurance carrier, Villanova, was insolvent whereas Sterling was fully covered for the loss by a solvent carrier, Zurich.

The court also partially shielded Solano from a posttrial ruling awarding prejudgment interest to the District. The District successfully sought prejudgment interest against Solano and Colonial on the theory that the total amount of its damages as to these defendants (but not as to Sterling) was certain for purposes of Civil Code section 3287, subdivision (a), because the amount had been uncontested at trial.[7] However, based on its interpretation of the Guarantee Act, the court ruled Sterling must be held responsible for prejudgment interest on $252,800 of the $389,968 in total damages even though the District had not claimed Sterling's share of liability for its damages was certain or capable of being made certain before trial.

Colonial was found jointly and severally liable for the full amount of the District's damages and award of prejudgment interest. The court found Colonial's performance bond incorporated all of the terms of Solano's contract with the District, including its covenants to maintain the integrity of the roof and restore improvements damaged by the work. The court rejected Colonial's claims that it was entitled to the benefit of Solano's defenses under the Guarantee Act.[8]

## G. *Consolidated Appeals*

We consolidated the ensuing appeals of Colonial (case No. A127186), Solano (case No. A127189), and Sterling (case No. A127244) for purposes of briefing, oral argument and decision.

---

[7] Civil Code section 3287, subdivision (a), authorizes an award of prejudgment interest from the date upon which the prevailing party's damages became "certain, or capable of being made certain by calculation" even if liability for the damages could not be established until trial.

[8] Although we overturn significant portions of the judgment rendered by the trial court in this decision, we do not do so due to any error on its part. To the contrary, the trial court addressed the complex and novel issues presented to it thoughtfully and persuasively. We reverse its decision based solely on an issue of law the trial court was not asked to consider.

## II. DISCUSSION

### A. *Solano's Appeal*

Solano contends Judge Henderson erred in denying its motion for summary judgment, relying on subdivision (c)(5) and Insurance Code section 1063.1, subdivision (c)(9)(B) (hereafter subdivision (c)(9)(B)).[9,10] According to Solano, these sections bar actions against the insureds of insolvent carriers seeking recovery against CIGA (1) by or on behalf of insurance pools like the JPA's based on a claimed right of subrogation and (2) by or on behalf of any entity other than the original claimant under the insured's policy based on a claimed right of subrogation. We find merit in the latter contention even though it is being raised for the first time on appeal.

> 1. *Applicability of Subdivision (c)(5) to Claims on Behalf of Joint Powers Risk Pools*

▮ We first consider whether the trial court erred in holding the JPA's are not insurers or insurance pools for purposes of subdivision (c)(5). NCSIG and NCR are joint powers entities specifically authorized by Government Code sections 990.4 and 990.8. Section 990.4 provides in part that local public entities may self-insure, purchase insurance from an insurer authorized to sell such insurance in this state, or employ a combination of these methods. (*Id.,* subds. (a), (b), (e).) Section 990.8 authorizes public entities who choose to self-insure to enter into joint powers agreements with other public entities to pool their self-insured claims and losses: "(a) Two or more local public entities, by a joint powers agreement . . . may provide insurance authorized by this part or for any other purpose by any one or more of the methods specified in Section 990.4. [¶] . . . [¶] (c) *The pooling of self-insured claims or losses among entities* as authorized in subdivision (a) of Section 990.4 *shall not be considered insurance nor be subject to regulation under the Insurance Code.*" (Italics added.)

---

[9] The language in subdivision (c)(5) on which Solano relies is as follows: " 'Covered claims' does not include any obligations to insurers, insurance pools, or underwriting associations, nor their claims for contribution, indemnity, or subrogation, equitable or otherwise, except as otherwise provided in this chapter. [¶] An insurer, insurance pool, or underwriting association may not maintain, in its own name or in the name of its insured, a claim or legal action against the insured of the insolvent insurer for contribution, indemnity or by way of subrogation, except insofar as, and to the extent only, that the claim exceeds the policy limits of the insolvent insurer's policy." (Ins. Code, § 1063.1, subd. (c)(5).)

[10] Subdivision (c)(9)(B) reads in pertinent part as follows: " 'Covered claims' does not include . . . a claim by a person other than the original claimant under the insurance policy in his or her own name . . . and does not include a claim asserted by an assignee or one claiming by right of subrogation, except as otherwise provided in this chapter." (Ins. Code, § 1063.1, subd. (c)(9)(B).) Insurance Code section 1063.1 defines the term "claimant" as "an insured making a first party claim or a person instituting a liability claim . . . ." (*Id.,* subd. (g).)

■ Even apart from Government Code section 990.4, subdivision (c), self-insurance is generally not considered to be "insurance." The Insurance Code defines "insurance" as "a contract whereby *one undertakes to indemnify another* against loss, damage, or liability arising from a contingent or unknown event." (Ins. Code, § 22, italics added.) The code defines an "insurer" as "[t]he person who undertakes *to indemnify another* by insurance . . . ." (Ins. Code, § 23, italics added.) " '[S]elf-insurance' is 'insurance of oneself or of one's own interests by the setting aside of money at regular intervals to provide a fund to cover possible losses.' " (*Alderson v. Insurance Co. of North America* (1990) 223 Cal.App.3d 397, 407 [273 Cal.Rptr. 7].) Drawing on one's own funds or reserves to pay for a loss is not indemnity. Thus, the case law has consistently held that an entity that self-insures is not an insurer within the meaning of Insurance Code sections 22 or 23 because a self-insurer enters into no contract to indemnify another. (*Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, 72, fn. 20 [70 Cal.Rptr.2d 118, 948 P.2d 909]; *Truck Ins. Exchange v. Amoco Corp.* (1995) 35 Cal.App.4th 814, 823 [41 Cal.Rptr.2d 551].)

The issue of whether self-insurers are to be treated as "insurers" for purposes of the Guarantee Act—and thus excluded under subdivision (c)(5) from recovering against CIGA—was squarely considered in *Black Diamond Asphalt, Inc. v. Superior Court* (2003) 114 Cal.App.4th 109 [7 Cal.Rptr.3d 466] (*Black Diamond*). Black Diamond Asphalt (Black Diamond) leased two trailers to a truck owner and hired him to haul materials for Black Diamond. (*Id.* at p. 113.) The contracts required the truck owner to maintain liability insurance naming Black Diamond as an additional insured and to indemnify the company for any liability arising out of the owner's performance of the contracts. (*Ibid.*) While hauling freight for Black Diamond, the owner was involved in an accident that killed one person and injured another, leading to a tort suit against Black Diamond and the truck owner. (*Ibid.*) The owner's liability insurer became insolvent and CIGA undertook its obligations. (*Ibid.*) Black Diamond, which was self-insured for the costs of defense and the first $1 million in damages, sought indemnity against the owner. (*Ibid.*) The trial court disallowed the claim on the grounds, in part, that subdivision (c)(5) barred an indemnity claim against the insured of an insolvent carrier. (*Black Diamond*, at pp. 113, 117.)

■ Distinguishing earlier cases holding *insurers* could not maintain subrogation actions against the insureds of insolvent carriers under the Guarantee Act, the Court of Appeal reversed, finding Black Diamond, to the extent of its self-insurance, was *not* barred from seeking indemnity under the Guarantee Act. (*Black Diamond, supra*, 114 Cal.App.4th at pp. 117–119.) The court reasoned as follows: "CIGA was established to protect members of the public from the insolvency of insurers by spreading throughout the industry a loss suffered by an insured as the result of the insolvency of an

insurer. [Citations.] CIGA was not intended to protect solvent insurers against risks they insured. . . . [It] accomplishes its purpose by assessing its member insurers for sums to cover claims brought by members of the public for which insurance is otherwise unavailable, while excluding coverage where payment would inure to the benefit of a solvent insurer. [Citation.] . . . [¶] Black Diamond has excess insurance only. By virtue of its self-insured retention limit, it is responsible for the costs of defense and the first $1 million in damages awarded against it. Black Diamond is not an insurer, and its retention limit is not insurance available to it. [Citations.] To the extent of its personal liability, Black Diamond is not seeking any payment or benefit on behalf of, or that will inure to, the benefit of an insurer." (*Id.* at pp. 118–119.)

■ Solano relies on *City of Laguna Beach v. California Ins. Guarantee Assn.* (2010) 182 Cal.App.4th 711 [106 Cal.Rptr.3d 552] (*Laguna Beach*) for the proposition that self-insurers are also barred from recovery under subdivision (c)(5). But *Laguna Beach* involves workers' compensation self-insurance, which is treated differently under CIGA than self-insurance for other types of claims or losses. Case law has held that CIGA does not have to provide a safety net *for an employer* to the extent it gambled on self-insuring for worker's compensation claims without private insurance. (See, e.g., *Denny's Inc. v. Workers' Comp. Appeals Bd.* (2003) 104 Cal.App.4th 1433, 1440–1441 [129 Cal.Rptr.2d 53] (*Denny's*).) The express rationale for the holdings of these cases is specific to workers' compensation insurance. The Labor Code defines "insurer" for purposes of workers' compensation to include employers "to whom a certificate of consent to self-insure has been issued." (Lab. Code, § 3211.) The court in *Denny's* found that the specific statutory definition of a workers' compensation insurer in the Labor Code supersedes the general Insurance Code definitions found in Insurance Code sections 22 and 23, and subjects self-insuring employers to all of the Guarantee Act's limitations on recovery against the insureds of insolvent carriers. (*Denny's*, at p. 1441; see also *Roth v. L.A. Door Co.* (2004) 115 Cal.App.4th 1249, 1259–1260 [10 Cal.Rptr.3d 1] [distinguishing the holdings of *Denny's* and *Black Diamond* on the basis the latter did not involve workers' compensation self-insurance].) Far from supporting Solano's position, the reasoning of workers' compensation insurance cases like *Denny's* and *Laguna Beach* suggests the Guarantee Act does not limit the right of self-insurers to recover against the insureds of insolvent carriers *absent a specific legislative declaration that self-insurance for the particular risk insured against is to be treated as insurance*. There is no such declaration in this case.

■ The fact the District pools its self-insurance payments, claims, and losses with other public entities does not distinguish it from other self-insurers for purposes of subdivision (c)(5). The subdivision's use of the term "insurance pools" does not suggest otherwise. Section 1063.1's reference to

insurance pools can be found in the original version of the statute adopted in 1969. (Stats. 1969, ch. 1347, § 3, p. 2699, eff. Sept. 2, 1969.) Joint authority risk pools did not even exist at that time. The legislation authorizing them was not adopted until 1976. (*City of South El Monte v. Southern Cal. Joint Powers Ins. Authority* (1995) 38 Cal.App.4th 1629, 1634–1635 [45 Cal.Rptr.2d 729] (*South El Monte*).) The term "insurance pool" is commonly used to refer to pooling agreements *between insurers*. According to Black's Law Dictionary, an "insurance pool" is "[*a*] *group of several insurers* that, to spread the risk, combine and share premiums and losses." (Black's Law Dict. (8th ed. 2004) p. 822, col. 2, italics added.) A joint powers risk pool does not fit within the recognized meaning of the term "insurance pool."

■ Nor is a joint powers risk pool "insurance" for purposes of Insurance Code sections 22 and 23. It is *not* a contract by which the joint authority agrees to *indemnify* its members from losses or claims. Here, each member's required contributions to the pool take into account the member's individual loss history, claims experience, and credits for subrogation recoveries. (See *Orange County Water Dist. v. Association of Cal. Water etc. Authority* (1997) 54 Cal.App.4th 772, 777 [63 Cal.Rptr.2d 182] (*Orange County Water Dist.*) [because the self-insured pool member agency ultimately pays back amounts paid out in its behalf, there is no shifting of the risk].)

If there were any doubt about the status of such pools, the Legislature resolved it by expressly declaring in Government Code section 990.8, "[t]he pooling of self-insured claims or losses" by local public agencies "shall not be considered insurance nor be subject to regulation under the Insurance Code." (*Id.*, subd. (c).) This is very broad language. Had the Legislature intended joint authority risk pools to be treated as insurance for some purposes, such as in Insurance Code section 1063.1, but not for others, it would have chosen its words differently. The courts have held in other legal contexts that joint authority risk pools are not to be treated as insurance. (See, e.g., *Southgate Recreation & Park Dist. v. California Assn. for Park & Recreation Ins.* (2003) 106 Cal.App.4th 293, 297–298 [130 Cal.Rptr.2d 728] [interpretation of coverage]; *Schools Excess Liability Fund v. Westchester Fire Ins. Co.* (2004) 117 Cal.App.4th 1275, 1285–1286 [12 Cal.Rptr.3d 626] [application of insurer's " 'other insurance' clause"]; *Orange County Water Dist., supra*, 54 Cal.App.4th at pp. 777–780 [" 'other insurance' clause"]; *South El Monte, supra*, 38 Cal.App.4th at pp. 1639–1640 [interpretation of coverage].) Solano fails to establish section 1063.1 requires a different result.

The trial court was correct in holding subdivision (c)(5) did not bar the District's claim against Solano.

### 2. *Applicability of Subdivision (c)(9)(B)*

For the first time in this appeal, Solano contends subdivision (c)(9)(B) bars the District's claim without regard to whether the JPA's are "insurers" or "insurance pools" for purposes of the Guarantee Act. According to Solano, that subdivision bars *any* claim for subrogation against the insured of an insolvent carrier, whoever brings such claim. Since all parties stipulated in the trial court that this was a subrogation action brought by the District on behalf of the JPA's, Solano argues the claim is barred even assuming the JPA's are not "insurers" or "insurance pools." Solano maintains that if anyone other than the "original claimant" under the insured's policy has paid the loss,[11] including a self-insurance pool, that entity is barred from obtaining reimbursement from the CIGA fund as a subrogee of the claimant under subdivision (c)(9)(B).

In general, new theories of defense may not be raised for the first time on appeal. (*Bardis v. Oates* (2004) 119 Cal.App. 4th 1, 13–14, fn. 6 [14 Cal.Rptr.3d 89].) However, a new theory raising a pure question of law on undisputed facts can be raised for the first time on appeal. (*Ward v. Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534]; *Francies v. Kapla* (2005) 127 Cal.App.4th 1381, 1386 [26 Cal.Rptr.3d 501].) In our view, Solano's new statutory argument does involve a pure question of law that can be resolved on undisputed facts. We will accordingly exercise our discretion to consider the argument despite Solano's failure to raise it below. (*People v. Smith* (2001) 24 Cal.4th 849, 852 [102 Cal.Rptr.2d 731, 14 P.3d 942].)

In response to Solano's summary judgment motion under subdivision (c)(5), the District did not dispute that this was a subrogation action; it only disputed whether the JPA's were insurers or insurance pools. In fact, the District came forward with evidence the District initiated this action against Solano on behalf of the JPA's under the subrogation provisions of the JPA's bylaws and memorandum of coverage, and that its recovery is deemed under those agreements to be the property of the JPA's. In his opening statement to the court at trial, counsel for plaintiff acknowledged the subrogation nature of the claims against Solano and Sterling: "[T]his is a subrogation action. We stepped into the shoes of the District under our memorandum of coverage. We are the joint power[s] association, and we can pursue the District's rights in subrogation to recover the funds we paid from all sources that the District could have collected money from itself." The District did not try this case on the theory that it incurred a direct or indirect financial loss as a result of the self-insurance aspects of its pooling agreements, nor did it prove the amount of such loss.

---

[11] The statute defines "claimant" as "an insured making a first party claim or a person instituting a liability claim." (Ins. Code, § 1063.1, subd. (g).)

■ We apply the usual rules of statutory interpretation in construing subdivision (c)(9)(B). The fundamental rule is to ascertain the intent of the Legislature in order to effectuate the purpose of the law. We look first to the words of the statute and try to give effect to the usual, ordinary import of the language. (*California Ins. Guarantee Assn. v. Workers' Comp. Appeals Bd.* (2004) 117 Cal.App.4th 350, 355 [12 Cal.Rptr.3d 12].) When the statutory language is clear and unambiguous there is no need for construction, and courts should not indulge in it. (*Ibid.*)

■ In our view, the import of the language of subdivision (c)(9)(B) is plain. With exceptions not applicable here, it bars any claims against the CIGA fund by "a person" other than the original claimant, and by "one claiming by right of subrogation." (Subd. (c)(9)(B).) The words "a person" and "one" are unqualified and all inclusive. They encompass insurers and noninsurers alike, and make no exception for any category of person or entity seeking to assert a claim for subrogation directly or indirectly against the insured of an insolvent carrier. The statute unambiguously excludes from the definition of "covered claim" *any* such claim.

Other appellate courts have reached the same conclusion. "[T]he language of . . . [subdivision (c)(9)(B)] excluding claims by right of subrogation [is] clear and unambiguous. We need not construe the statute; its meaning is clear—. . . a claim by right of subrogation is not a 'covered claim.'" (*California Ins. Guarantee Assn. v. Argonaut Ins. Co.* (1991) 227 Cal.App.3d 624, 633 [278 Cal.Rptr. 23] (*Argonaut*); see also *California Ins. Guarantee Assn. v. Workers' Comp. Appeals Bd.* (2005) 128 Cal.App.4th 307, 315 [26 Cal.Rptr.3d 845].) In *E. L. White, Inc. v. City of Huntington Beach* (1982) 138 Cal.App.3d 366 [187 Cal.Rptr. 879] (*E. L. White*), the company's insurer, Royal Globe Insurance Company (Royal Globe), brought an action in subrogation against the City of Huntington Beach after it paid part of two tort judgments entered against the company and the city arising from an accident. (*Id.* at p. 369.) The city's excess insurer, which would otherwise have been responsible for partially indemnifying Royal Globe, had become insolvent. (*Ibid.*) The Court of Appeal held Royal Globe could not maintain an action for indemnity against the city, relying in part on the provisions of former subdivision (c)(7) of Insurance Code section 1063.1, now contained in subdivision (c)(9)(B), which it found to be clear and unambiguous: " '[C]overed claims' do not include 'any obligations to insurers, insurance pools, or underwriting associations . . .' [citation], nor do they include 'any claim by any person other than the original claimant under the insurance policy in his own name . . . [or] any claim asserted by an assignee or one claiming by right of subrogation . . . .' [Citation.] Because Royal Globe is an insurer *and because its claim is by right of subrogation,* it may not seek payment from CIGA. *Such is the clear and unambiguous language of the statute.*" (*E. L. White,* at pp. 370–371, italics added; see also *Collins-Pine Co. v. Tubbs*

*Cordage Co.* (1990) 221 Cal.App.3d 882, 887–888 [271 Cal.Rptr. 20] [insolvent carrier's insured is protected from subrogation claims by insurers or noninsurers].)

On appeal, the District admits this case was tried as a subrogation claim, but argues that the judgment entered against Solano "is not a 'subrogation' claim in the context of the CIGA regulations," because it "represents the return of 'self-insured' funds" to the District. However, the JPA's own bylaws define "subrogation" as "the recovery of payments, which the Authority has made on behalf of a Member," and further provide that "[s]ubrogation monies are the property of the Authority." In its simplest terms, subrogation "is defined as the substitution of another person in place of the creditor or claimant to whose rights he or she succeeds in relation to the debt or claim." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1291 [77 Cal.Rptr.2d 296].) A subrogation action may be brought by the subrogee in the name of the subrogor, as occurred in this case. (See, e.g., *McKinley v. XL Specialty Ins. Co.* (2005) 131 Cal.App.4th 1572, 1575 [33 Cal.Rptr.3d 98]; *Meyer Koulish Co. v. Cannon* (1963) 213 Cal.App.2d 419, 423 [28 Cal.Rptr. 757].) The District cites nothing in the text or legislative history of subdivision (c)(9)(B) suggesting the Legislature intended the word "subrogation" to carry some specialized meaning there that would exclude subrogation recoveries sought on behalf of governmental self-insured risk pools.

We recognize that policy considerations might militate in favor of the distinction the District urges upon us. Unlike the prototypical insurance subrogation case, the subrogor in this case does have a material financial stake in the subrogees' recovery. Under the JPA's bylaws, the amount of that recovery would be credited to the District's account for purposes of calculating its pool contribution, and the failure to recover from Solano will have a detrimental financial effect on the District.[12] The Legislature may well not have intended to exclude subrogation claims like that in issue here when subdivision (c)(9)(B) was adopted. But such speculation about policy goes beyond our limited role in the interpretation of statutes. We agree with the Court of Appeal in *Argonaut*, which explained as follows its reasons for rejecting an earlier case holding that a literal interpretation of the no-subrogation provision would undermine workers' compensation objectives: "The *Burrow* court [*Burrow v. Pike* (1987) 190 Cal.App.3d 384 [235 Cal.Rptr. 408]] goes beyond construing or interpreting the statute; it rewrites Insurance Code section 1063.1 based on its perception that the statute as written overlooks an important policy consideration. Crafting statutes to conform

---

[12] There was no evidence in the record of the exact financial impact of a subrogation recovery on the District, but Solano conceded at oral argument the District would obtain some benefit from a recovery.

with policy considerations is a job for the Legislature, not the courts; our role is to interpret statutes, not to write them." (*Argonaut, supra*, 227 Cal.App.3d at pp. 633–634.)

For these reasons, we reverse the District's judgment against Solano on its complaint, including its award of prejudgment interest against Solano.[13]

## B. *Colonial's Appeal*

Colonial attacks the judgment on three grounds: (1) the District failed to plead or prove, and the court failed to make findings on essential elements of equitable subrogation; (2) Colonial is entitled to the benefit of any defenses Solano has under the Guarantee Act; and (3) the judgment is inconsistent with Colonial's statutory rights as a surety under Civil Code sections 2845 and 2849.

■ Before addressing Colonial's contentions, we first emphasize that the circumstances presented here are unusual. A construction performance bond is not an insurance policy. (*Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 60 [86 Cal.Rptr.2d 855, 980 P.2d 407] (*Cates*).) Unlike insurance, a performance bond creates a tripartite relationship between the surety (Colonial), the principal (Solano), and the obligee (the District). (*Id.* at p. 58.) Whereas insurance protects the principal against risk, the performance bond protects the obligee against the principal's default. There will seldom be overlapping coverage between such a bond, which guarantees performance of a contract, and the contractor's liability insurance policy, which indemnifies the contractor from injury claims based on negligence or accident.[14]

As the trial court recognized, the facts in this case are not typical. Solano's contract contained numerous provisions requiring it to protect its work and the District's property from rain or moisture damage, and to repair or replace any District property damaged by its work. For example, the contract provided, "Temporary covering of all tear-off areas and responsibility for all damage to buildings and contents are the work of the Re-Roofing Contract . . . ." Solano was required to "[m]aintain continuous temporary protection prior to and during insulation of [the] new roofing system," and "[p]rovide temporary weather tight enclosure of [the] exterior walls . . . as

---

[13] Solano was not found liable for prejudgment interest on the $150,493.45 portion of the District's repair costs funded by ICW, consistent with Judge Henderson's summary judgment ruling that Solano was not liable for the principal amount.

[14] See Barnes & Hawkins, *Surety Liability for Contractor Deficiencies* (Mar. 2002) Construction Briefings No. 2002-3 (two most common circumstances of overlapping liability are cases involving construction defects discovered after final acceptance and cases in which the underlying contract contains broad indemnity language).

[the] work progress[ed]." The contract further provided Solano would "[b]ear all costs for replacement of damage to existing or new construction from weather effects," "[r]estore any improvements damaged by this work to their original condition as acceptable to the owner," and repair or replace all "[f]inished work damaged by operations under this contract . . . at no extra cost to the owner."

As a proximate result of Solano's failure to adequately protect the structure, water penetration from the June 2001 rains caused damage to much of Redwood Elementary School's newly remodeled and painted ceilings, insulation, walls, and telephone system, as well as to library books, computer equipment, and other school property and improvements.

█ When a bond is issued for the performance of a construction contract, the nature and extent of the surety's liability is determined by reference to the bond and the contract. (*Cates, supra,* 21 Cal.4th at pp. 40–41 [holding surety liable for delay damages where construction contract provided that time limits specified therein were " 'of the essence of the Contract' "]; see also *Pacific Employers Ins. Co. v. City of Berkeley* (1984) 158 Cal.App.3d 145, 151–152 [204 Cal.Rptr. 387] (*Pacific Employers*) [performance bond that incorporates underlying contract by reference must be read and construed in conjunction with the contract].) The performance bond in this case could not have been more explicit in tying Colonial's obligations under the bond to Solano's performance or nonperformance of all the covenants, conditions and agreements of the underlying contract. After referencing the reroofing contract between Solano and the District in a "whereas" clause, the bond provided Solano and Colonial were "held and firmly bound" to pay the District $713,999, unless Solano "shall *in all things* stand to and abide by, and well and truly keep and perform *the covenants, conditions, and agreements in the said contract* and any alteration thereof made *as therein provided,* on his or their parts to be kept and performed at the time and *in the manner therein specified,* and *in all respects* according to their true intent and meaning, and shall indemnify and save harmless [the District], its officers and agents, *as therein stipulated* . . . ." (Italics added.)

Here, Solano defaulted in its contractual covenants to protect the District's property from weather effects, and to repair or replace any District property damaged by its work. These contractual defaults triggered Colonial's liability under the bond.[15] Solano's negligence in failing to secure the roof against

---

[15] Colonial makes no assertion the trial court erred in analyzing its contractual liability under the bond. In its reply brief, however, it advances an argument in a different connection that a performance bond surety is not liable for property damage or personal injury unless the bond specifically so provides. Colonial fails to note that the out-of-state cases it inaccurately cites for this proposition all involve tort claims by third parties, not contract default claims by

rain, and the resulting property damage, also triggered coverage under Solano's commercial general liability insurance policy issued by Villanova.[16]

We turn now to Colonial's claims of error.

### 1. *Pleading and Proof of Subrogation*

As discussed, the District's repair costs in this case were paid for by the JPA's, not by the District itself or by Solano or Colonial. As with the District's claim against Solano, its claim against Colonial proceeded to trial on the premise that this was a subrogation action brought by the District on behalf of the JPA's. Colonial contends the District was therefore required to plead and prove the following eight elements specific to "insurer" subrogation claims: "(1) the insured [here, the District] suffered a loss for which the subrogation defendant [here, Colonial] is liable, either as the wrongdoer whose act or omission caused the loss or because the defendant is legally responsible to the insured for the loss caused by the wrongdoer; (2) the claimed loss was one for which the insurer [here, the joint powers authorities] [were] not primarily liable; *(3) the insurer has compensated the insured in whole or in part for the same loss for which the defendant is primarily liable*; (4) the insurer has paid the claim of its insured to protect its own interest and not as a volunteer; (5) the insured has an existing, assignable cause of action against the defendant which the insured could have asserted for its own benefit had it not been compensated for its loss by the insurer; (6) the insurer has suffered damages caused by the act or omission upon which the liability of the defendant depends; *(7) justice requires that the loss be entirely shifted to the defendant, whose equitable position is inferior to that of the insurer*; and (8) the insurer's damages are in a liquidated sum, generally the amount paid to the insured." (Original emphasis.) These elements are drawn from *State Farm General Ins. Co. v. Wells Fargo Bank, N.A.* (2006) 143 Cal.App.4th 1098, 1111–1112 [49 Cal.Rptr.3d 785] (*State Farm*). Colonial argues in

the obligee of the bond. (See, e.g., *Tri-State Ins. Co. v. U.S.* (8th Cir. 1965) 340 F.2d 542 (*Tri-State*); see also *State Highway Administration v. Transamerica Ins. Co.* (1976) 278 Md. 690, 706–707 & fn. 11 [367 A.2d 509] [explaining *Tri-State* and similar cases involve claims by third parties, not parties to the bond].) Under California law, a performance bond must be construed more broadly in favor of the party for whom the contract was to be performed than for a third party. (*Pacific Employers, supra*, 158 Cal.App.3d at p. 151.)

[16] For a case strikingly similar on the facts, see *Hartford Fire Ins. v. Riefolo Construction Co.* (1978) 161 N.J. Super. 99, 115–117 [390 A.2d 1210, 1218–1219] and the New Jersey Supreme Court case of the same name affirming it, (1980) 81 N.J. 514, 525–526 [410 A.2d 658, 663–664], involving fire damage at a school under construction. A bond with language similar to that here (covering "all the covenants, conditions, and agreements" of the underlying contract) was held to overlap with the owner's fire insurance policy where the contract included the contractor's covenant to " 'guard and protect his own work, and that of adjacent property, from damage' " and to " 'replace or make good' " any damage until the building was accepted. (390 A.2d at p. 1211.)

particular that based on the undisputed facts, the District and the JPA's cannot satisfy element No. 3 (defendant Colonial must be primarily liable for the loss) or No. 7 (the JPA's have superior equities relative to Colonial).

 We reject Colonial's analysis on two grounds. First, applying the "theory of trial" doctrine, we find Colonial is estopped to claim any failure of pleading or proof, or absence of findings with respect to subrogation because, with Colonial's acquiescence, the court and the parties tried this case on the assumption the JPA's had no burden beyond proving the defendants' respective liabilities as a matter of contract or tort law for the costs of repairing the property damage the District incurred. (See 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 407, pp. 466–468.) "Where the parties try the case on the assumption that a cause of action is stated, that certain issues are raised by the pleadings, that a particular issue is controlling, or that other steps affecting the course of the trial are correct, neither party can change this theory for purposes of review on appeal." (*Id.* at p. 466.) Second, we decline in any event to extend the superior equities doctrine (and the other elements of insurance subrogation), or the case law Colonial relies upon, to joint powers self-insurance pools seeking to recover funds that would otherwise have to be paid by their member agencies.

Colonial did not demur to the District's complaint or file any other motion attacking the sufficiency of the complaint with respect to subrogation. Colonial asserted no defense based on superior equities or lack of primary liability. Prior to the trial of the District's subrogation claim, Colonial's counsel told the court that Colonial's liability depended on a pure issue of law—whether its obligations under the bond were fully performed and discharged when Solano completed the roof work and was paid in full by the District for the job. Counsel represented that Colonial, as distinct from its principal, Solano, had no "role in a factual-based setting," did not intend to cross-examine witnesses, and had "no role at the trial per se in the sense that . . . our principal is being defended." The District's counsel stated during the colloquy that since the JPA's were subrogated to the District's contractual rights against Colonial under the bond, Colonial's liability would be "triggered" if the District could demonstrate the water damage was a product of Solano's failure to perform covenants of its contract with the District. Colonial's counsel did not reply or object to this statement during this colloquy, nor did Colonial suggest it took issue with the District's pleading or proof of any element of subrogation.

Trial testimony took place over eight days ending on April 22, 2009. True to its word, Colonial called no witnesses of its own, introduced no evidence, and conducted only minimal cross-examinations of a few of the witnesses called by the other parties. It never raised the subrogation proof issue by

nonsuit motion or other motion. The District filed a written summation after trial on May 15, 2009, and Colonial filed its response on June 11, 2009. The response argued the District failed to prove its breach of contract claim against Colonial, but it raised no issue regarding the pleading or proof of the elements of insurance subrogation. On June 30, 2009, the court filed a tentative decision. Colonial responded with a request for a statement of decision seeking clarification and detailed findings on numerous issues. The request did not seek clarification or findings regarding the elements of insurance subrogation.[17,18]

Colonial did not articulate the position on subrogation it is taking now until October 6, 2009, more than five months after the trial ended, at the conclusion of a hearing held just before judgment was to be entered, to finalize the wording of the court's statement of decision and judgment. The court responded with incredulity. It pointed out the issue had not been raised before and the case had been tried on the premise, seemingly shared by the parties, that the JPA's equitable right to seek subrogation was not in issue. The court said it felt "bushwhacked" because the case had been tried under an apparent agreement between the parties as to the scope of the material issues to be tried, and Colonial was raising an entirely new issue outside that scope.

In our view, the facts show Colonial waived the issues it is now raising by inducing the court and the parties to assume before and throughout the trial there were no factual issues affecting its liability to be tried (except those relevant to Solano's liability), and Colonial's liability could be decided as a matter of law. " 'The rule is well settled that the theory upon which a case is tried must be adhered to on appeal. A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant.' " (*Coy v. E. F. Hutton & Co.* (1941) 44 Cal.App.2d 386, 391 [112 P.2d 639].) Colonial's belated attempt to raise the issue in the trial court just before entry of judgment cannot avoid application of this rule. (See, e.g., *Strasberg v. Odyssey Group, Inc.* (1996) 51 Cal.App.4th 906, 920 [59 Cal.Rptr.2d 474]; *Durkee v. Chino Land and Water Co.* (1907) 151 Cal. 561, 569 [91 P. 389].) Although application of the "theory of trial" doctrine is discretionary, especially when it is claimed there has been a complete failure

---

[17] We reject Colonial's claim that its request for a statement of the legal and factual basis for the District's legal standing to bring the suit "raised the issue of the District's failure to plead and prove the required elements of [insurance] subrogation."

[18] Colonial hinted obliquely at the issue in a filing made on August 6, 2009, opposing an award of prejudgment interest, but the comments buried in that context would not have put the court or the parties on notice of the issue Colonial has raised in this appeal. We note that in its written objections to the proposed statement of decision filed two weeks later, Colonial made no further mention of the issue.

of proof (9 Witkin, Cal. Procedure, *supra*, Appeal, § 414, p. 472), we believe the unfairness of allowing Colonial to raise the issue weighs in favor of its application here.

 In any event, we do not believe the equitable principles that apply to insurance subrogation cases are controlling in this case, at least as to the JPA's. Those principles, their historical roots, and the case law applying them were well summarized in *State Farm, supra*, 143 Cal.App.4th at pages 1105–1111. As *State Farm* makes clear, the most important California precedent in this field is *Meyers v. Bank of America etc. Assn.* (1938) 11 Cal.2d 92 [77 P.2d 1084] (*Meyers*), a case upon which Colonial heavily relies. (*State Farm*, at pp. 1107–1111.) In *Meyers*, California adopted the superior equities doctrine, which prevents an insurer that has paid for its insured's loss from recovering its payments against a party whose equities (meaning its innocence in causing the loss) are equal or superior to those of the insurer. (*State Farm*, at p. 1107.) Thus, in *Meyers* the court held a surety on a fidelity bond insuring the faithful performance of an employee could not recover from the employer's bank the amount the surety paid to the employer as reimbursement for forged checks the employee cashed at the bank. (*Meyers*, at p. 103.) Applying the superior equities doctrine, the *Meyers* court reasoned the surety's right to recover from the bank did not stand on the same footing as its right to recover from the dishonest employee. The surety had paid what it contracted to pay under its indemnity contract with the employer and retained the premiums and benefits of that contract for its own use. The bank had its own contractual duty to the employer under an entirely separate agreement, but it had no reason to doubt the genuineness of the checks and its honoring of the checks was not the primary cause of the loss. (*Meyers*, at pp. 102–103.) From this, the court concluded: "We cannot say that as between the bank and the paid indemnitor, the bank should stand the loss. . . . [¶] . . . [S]ince the bonding company had no superior equities, it was not entitled to be subrogated to any claim plaintiff might have had against the bank." (*Id.* at p. 103.)

According to Colonial, *Meyers* is a controlling precedent in this case and demonstrates as a matter of law the JPA's could not have proven their superior equities relative to Colonial. Under Colonial's analysis, neither the JPA's nor Colonial were wrongdoers, but each had independent contractual liabilities to the District under, respectively, the memorandum of coverage and the performance bond. Following *Meyers*, the satisfaction by the JPA's of their primary liability does not entitle them to recover from Colonial, as the District's subrogees, upon Colonial's totally different contractual liability to the District. (See *Meyers, supra*, 11 Cal.2d at p. 102; see also *Patent Scaffolding Co. v. William Simpson Constr. Co.* (1967) 256 Cal.App.2d 506 [64 Cal.Rptr. 187] (*Patent Scaffolding*).)

The majority in *State Farm* questioned the continued vitality of the superior equities rule and suggested that its validity, scope, and application would benefit from clarification by our Supreme Court, which has not revisited those questions since *Meyers* was decided in 1938. (*State Farm, supra*, 143 Cal.App.4th at pp. 1109, 1111 & fn. 10.) Justice Ruvolo in his concurring opinion went even further, proposing the Supreme Court declare the rule a "judicial anachronism." (*Id*. at p. 1120 (conc. opn. of Ruvolo, J.).) In view of the criticism the doctrine has received, and its declining acceptance by the courts, we are especially wary of extending it to a set of facts to which it does not clearly apply.

We do not believe the unique facts of this case fit within the superior equities paradigm, at least as to the payments not funded by ICW. First, this is not a typical insurance subrogation case. The JPA's are not insurers who received compensation in return for assuming the District's risks. They are pools formed between *self-insured* public agencies. Each member agency retains its own risks because, ultimately, it must pay back at least some of the amounts the JPA's advance on its behalf. (*Orange County Water Dist., supra*, 54 Cal.App.4th at p. 777.) For their part, the JPA's do not make money by accepting risk in return for premiums. They essentially function as nonprofit, depositor-owned banks, extending temporary credit to their member agencies to cover losses. The JPA's are therefore not equivalent to "compensated sureties" who have historically been presumed by courts to have a lesser entitlement (and greater burden of proof) in trying to recoup their losses from third parties than the insured party itself has, because their business profit is based on agreeing to assume such losses.[19]

Second, unlike *Meyers* and *Patent Scaffolding*, the subrogor in this case has a substantial stake in its subrogees' recovery. Absent a recovery of the JPA's payments (at least the two payments not reinsured by ICW), the District will not be made whole for its loss because it is required to repay the JPA's in the form of higher contribution rates. To a large degree, the equities to be balanced are not Colonial's versus the JPA's, but Colonial's versus the District's. In our view, a balancing of the equities in this case would not have changed the result.

We therefore reject Colonial's arguments regarding equitable subrogation on substantive as well as procedural grounds.

---

[19] Even if we assume the actuarial formulas used to calculate the District's annual contributions do not allocate 100 percent of the loss back to the District, the equitable position of the other public agencies that collectively bear some portion of the District's loss is really no different than the District's. As members of the pool, they have not "assumed risks calculated to produce profits," but have agreed to share in the District's loss on this occasion in return for the District's reciprocal agreement to bear a share in their losses when the time comes. (*State Farm, supra*, 143 Cal.App.4th at p. 1110, fn. 9.)

## 2. *Colonial's Entitlement to Solano's CIGA Defenses*

The trial court found Solano and its surety, Colonial, were jointly and severally liable for the full amount of the District's damages and prejudgment interest. However, pursuant to Insurance Code section 1063.1 and Judge Henderson's ruling on Solano's motion for summary judgment, the court held the District could not collect from Solano the portion of its claim ($150,493.45) that had been reimbursed to the JPA's by solvent reinsurer, ICW, or prejudgment interest on that amount. In addition, applying section 1063.1, subdivision (c)(9)(A),[20] the court found Sterling (and Colonial), but not Solano, must satisfy the $252,800 portion of the judgment for which Sterling and Solano were jointly and severally liable (along with Colonial). The latter holding was based on the fact that "other insurance" was available to satisfy the claim—proceeds from Sterling's solvent liability carrier, Zurich—while Solano's liability would otherwise have to be paid by CIGA. This reduced CIGA's effective liability on behalf of Solano to $66,489, while Colonial suffered a judgment of $703,364.

Colonial argues the trial court erred by denying it the benefit of Solano's CIGA defenses. It relies upon the general rule codified in Civil Code section 2810 that "a surety is entitled to assert as defenses to payment of a surety bond all defenses available to its principal" (*Cates, supra*, 21 Cal.4th 28, 48), and denies the statutory exceptions to this rule set forth in Civil Code sections 2810 and 2825 apply to Solano's CIGA defenses, as the trial court ruled. As it did in the trial court, Colonial also cites Civil Code section 2809, which specifies in substance that the surety's obligation is no greater than the principal's. According to Colonial, the trial court's rulings denying it Solano's CIGA defenses effectively deprive Solano of those defenses as well. Colonial points out that a surety is entitled by law to reimbursement from its principal for any payments it is required to make upon the principal's default.[21] Since Colonial can sue Solano for reimbursement of any amounts it is required to pay in satisfaction of the District's judgment, Colonial reasons that the denial of Solano's CIGA defenses to Colonial exposes Solano to the very liabilities from which those defenses are designed to protect it.

Civil Code section 2809 is unavailing. That section provides: "The obligation of a surety must be neither larger in amount nor in other respects more

---

[20] Insurance Code section 1063.1, subdivision (c)(9)(A) states: " 'Covered claims' does not include . . . a claim to the extent it is covered by any other insurance of a class covered by this article available to the claimant or insured . . . ."

[21] See Civil Code sections 2846 ("[a] surety may compel his principal to perform the obligation when due") and 2847 ("[i]f a surety satisfies the principal obligation, or any part thereof, whether with or without legal proceedings, the principal is bound to reimburse what [the surety] has disbursed, including necessary costs and expenses . . . .").

burdensome than that of the principal; and if in its terms it exceeds it, it is reducible in proportion to the principal obligation." Solano's "obligation" in this case consisted of all of the covenants and obligations in its contract with the District. That contract established the scope of Solano's and Colonial's obligation. (See *U. S. Leasing Corp. v. duPont* (1968) 69 Cal.2d 275, 290 [70 Cal.Rptr. 393, 444 P.2d 65].) Unrelated events that occurred after Solano's breach and default of its contractual covenants, such as the insolvency of its insurer and triggering of the Guarantee Act, did not in any fashion alter the scope of Solano's or Colonial's contractual "obligation" for purposes of section 2809. The only issue is whether those occurrences afforded Solano a partial *defense to liability* that Colonial is also entitled to assert. For the reasons that follow, we believe the trial court properly ruled against Colonial on that point.

Civil Code section 2810 provides in relevant part: "A surety is liable, notwithstanding any mere personal disability of the principal, though the disability be such as to make the contract void against the principal; but he is not liable if for any other reason there is no liability upon the part of the principal at the time of the execution of the contract, or the liability of the principal thereafter ceases, unless the surety has assumed liability with knowledge of the existence of the defense." In *Post Bros. Constr. Co. v. Yoder* (1977) 20 Cal.3d 1 [141 Cal.Rptr. 28, 569 P.2d 133], the Supreme Court construed section 2810 to mean a "surety is entitled to [a] principal's defenses *other than personal defenses* unless [it] assumed liability with knowledge of the defenses." (*Post Bros.*, at p. 8, italics added.) Civil Code section 2825 states: "A surety is not exonerated by the discharge of his principal by operation of law, without the intervention or omission of the creditor."

The application of these sections is illustrated in *Gottschalk v. Draper Companies* (1972) 23 Cal.App.3d 828 [100 Cal.Rptr. 434] (*Gottschalk*). The appellants in *Gottschalk* guaranteed full payment under two promissory notes issued by the buyer of certain real property to the sellers. (*Id.* at p. 829.) The notes were secured by purchase money deeds of trust that were junior to another encumbrance on the property. (*Id.* at pp. 829–830.) Due to a foreclosure sale by the trustee of the senior deed of trust, the sellers' security for the two notes was extinguished. (*Id.* at p. 830.) Since a deficiency judgment against the buyer was unavailable under Code of Civil Procedure section 580b,[22] the sellers sued appellants on the written guarantees.

---

[22] Code of Civil Procedure section 580b reads in pertinent part: "No deficiency judgment shall lie in any event after a sale of real property . . . for failure of the purchaser to complete his or her contract of sale, or under a deed of trust . . . given to the vendor to secure payment of the balance of the purchase price of that real property . . . ."

(*Gottschalk*, at p. 830.) The trial court granted summary judgment in favor of the sellers, and the guarantors appealed. (*Id.* at p. 829.)

 Based on Civil Code section 2810, the appellants asserted they had no liability under the guarantee because the liability of their principal, the buyer, had ceased by virtue of Code of Civil Procedure section 580b. (*Gottschalk, supra,* 23 Cal.App.3d at p. 830.) The Court of Appeal rejected the appellants' argument. The court reasoned section 580b did not erase or discharge the buyer's *indebtedness* to the sellers when the foreclosure sale occurred; it merely barred the sellers' *recovery* against the buyer. (*Gottschalk,* at p. 831.) The court stated: "It is a well known principle of law that a bar of remedy against the principal debtor does not prevent the right of recovery against the guarantor [citation] and the creditor is not precluded from seeking redress upon or enforcing any other security [citation]. [¶] . . . [I]t follows that since the principal debtor . . . has remained liable after the foreclosure sale and section 580b has barred only [the sellers'] *remedy* against it, appellants cannot avail themselves of a defense based upon Civil Code section 2810, *which requires the nonexistence or cessation of the principal's liability to make the surety also exempt.*" (*Ibid.,* second italics added.)

The court in *Gottschalk* held the guarantors would still be liable to the sellers under Civil Code section 2825 even assuming for the sake of analysis the foreclosure sale *did* terminate the buyer's liability. The court stated: "[W]hile ordinarily whatever discharges the principal debtor will discharge the surety too, this rule does not apply where the discharge is *by operation of law or where the defense is personal . . . .*" (*Gottschalk, supra,* 23 Cal.App.3d at p. 831, italics added.) The court found a discharge of the buyer's liability under Code of Civil Procedure section 580b was a discharge by operation of law under Civil Code section 2825: "[A]ny discharge of [the buyer's] liability, if at all, took place by a mere application of the relevant code provision (Code Civ. Proc., § 580b) without any 'intervention or omission of the creditor' [(the sellers)]. Since the bar of the remedy against [the buyer] came about by operation of law, the provisions of Civil Code section 2825, are clearly applicable prohibiting appellants from exoneration." (*Gottschalk,* at pp. 831–832.) The court also observed Code of Civil Procedure section 580b provided a defense personal to the principal debtor, and the guarantors would therefore also be liable under the alternative " 'personal defense' test." (*Gottschalk,* at p. 832.)

 By its terms, Insurance Code section 1063.1 does not address or limit the liabilities of any persons insured by insolvent carriers. For the most part, it merely defines the term "covered claims" for purposes of determining whether such liabilities are or are not compensable by CIGA under section 1063.2, subdivision (a). In section 1063.1, subdivision (c)(5), it goes a little

further by actually limiting the claims or legal actions that certain entities may institute against the insureds of insolvent carriers. But even that provision is quite narrow. It does not prevent any individual or entity from suing the insured of an insolvent carrier for any liability or obligation as long as the suit is either (1) not in the name of or on behalf of an insurance entity for contribution, indemnity, or by way of subrogation; or (2) for any claim to the extent it exceeds the limits of the insolvent insurer's policy. (Ins. Code, § 1063.1, subd. (c)(5).) Even more than Code of Civil Procedure section 580b as construed in *Gottschalk*, Insurance Code section 1063.1 does not affect the underlying liability or indebtedness of Colonial's principal, it affects at most the remedies certain entities may pursue against it. Colonial concedes this point in its reply brief. Thus, Colonial "cannot avail [itself] of a defense based upon Civil Code section 2810" because that section "requires the nonexistence or cessation of the principal's *liability* to make the surety also exempt." (*Gottschalk, supra*, 23 Cal.App.3d at p. 831.)

Even assuming Solano's CIGA defenses did affect its liability, we would in any event construe them as being personal to Solano and as defenses that apply "by operation of law, without the intervention or omission of [the District]," for purposes of Civil Code section 2825. Insurance Code section 1063.1 protects the insured of an insolvent carrier. Only Solano, not Colonial, has that status. Solano entered that status and became entitled to assert CIGA defenses not as a result of any act by the District or the JPA's, but due solely to the insolvency of its liability carrier. In our view, the trial court correctly held Civil Code sections 2810 and 2825 are inconsistent with Colonial's claim that Insurance Code section 1063.1 afforded Colonial the same protection in this lawsuit that it afforded to Solano.

Colonial also argues the practical effect of denying it Solano's defenses under the Guarantee Act will be to deny Solano those defenses as well, because it will be entitled to reimbursement from Solano for any amounts it has to expend in the future to satisfy the judgment rendered here. Colonial urges that by failing to recognize its right to assert Solano's defenses under the Guarantee Act, we would undermine the policy of the Guarantee Act to protect the insureds of insolvent carriers from loss. We are not persuaded.

First, Colonial is asking this court to *assume* any loss resulting from finding it liable here will ultimately fall on Solano. In fact, Solano's liability, if any, to Colonial has not yet been adjudicated. This court is not empowered to make speculative assumptions about the likelihood, course, or outcome of future events. Colonial's claim may in fact be a "covered claim" under the Guarantee Act, in which case the loss could fall on CIGA rather than

Solano.[23] On the other hand, the "contractual liability" exclusion or some other exclusion in Solano's Villanova policy may make the Guarantee Act irrelevant. There are still other possibilities. Solano may have liability coverage under a different policy that will be triggered by Colonial's claim for reimbursement. Solano may be judgment proof. None of these issues were presented or resolved in this litigation. Speculation about future events and matters outside the record cannot support a valid defense to Colonial's liability here.

Second, even assuming the loss would ultimately fall on Solano, that would still not afford Colonial a defense in this action. The Guarantee Act does not protect Solano from any and all liabilities. It protects it only against loss *caused by the insolvency of its liability insurer*. (See *Black Diamond, supra*, 114 Cal.App.4th at p. 118.) Solano's future liability to Colonial, if any, arose directly from Solano's own default on its contractual obligations to the District. When that default occurred, Colonial immediately became liable to the District "without demand or notice." (Civ. Code, § 2807.) This was two years *before* Solano's liability carrier became insolvent. Under the express terms of its bond, Colonial would have had joint and several liability to the District along with Solano even if Villanova had remained solvent.[24] Since any liability Solano may ultimately have to Colonial arose independently of Villanova's insolvency, enforcing the District's rights under the performance bond does not interfere with the Guarantee Act's objectives. On the other hand, not enforcing those rights because Solano's insurance carrier has become insolvent deprives the District of a second layer of protection for which it bargained and paid in its contract with Solano. That contract expressly required Solano to obtain a faithful performance bond *as well as* specified forms of liability insurance. To the extent of any overlap in coverage between the two, the District was contractually entitled to the *independent* protection of *both*, even if Solano is ultimately liable for Colonial's loss. To hold, as Colonial urges, that the insolvency of Solano's liability insurer automatically nullifies its performance bond would frustrate the District's contract rights and the public's protection against loss.

For these reasons, we affirm the trial court's ruling Colonial is not entitled to Solano's defenses under the Guarantee Act.

---

[23] See, e.g., Turner, Insurance Coverage of Construction Disputes (2010) section 2:11 and cases cited therein for examples of cases in which sureties' reimbursement claims against their principals have been held to be covered by the principal's comprehensive general liability policy.

[24] The bond provides that Colonial and Solano bound themselves (and their successors) "jointly and severally" to payment of the bond amount.

### 3. *Application of Civil Code Sections 2845 and 2849*

Colonial contends the judgment conflicts with its rights under Civil Code sections 2845 and 2849.[25],[26] According to Colonial, Solano's liability coverage and the property damage coverage provided by the JPA's constituted "other remed[ies] in the creditor's power" and "security for the performance of [Solano's] obligation" for purposes of these provisions. The District's election to exercise these "remed[ies]" and to avail itself of the resulting "security," discharged Colonial's obligations under the bond.

We reject Colonial's arguments. First, Colonial raised no issues under Civil Code sections 2845 or 2849 in the trial court. To the extent that the applicability of either section might turn on factual questions that could have been explored at trial, Colonial failed to preserve these statutory claims for appellate review. (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 685 [24 Cal.Rptr.3d 338].)

Second, we would find Civil Code sections 2845 and 2849 inapplicable as a matter of law in any event. Colonial effectively concedes that section 2845 is factually inapplicable in the present case because it made no predicate demand that the District pursue insurance remedies. By the time Colonial was first notified of the District's loss, the District had already obtained payments from the JPA's. By its terms, section 2845 is inapplicable in this circumstance. (See *United California Bank v. Maltzman* (1974) 44 Cal.App.3d 41, 54 [118 Cal.Rptr. 299] [demand must be made as a prerequisite to maintaining an action under § 2845; appeal is too late to raise demand].)

More fundamentally, both Civil Code sections 2845 and 2849 concern a surety's rights with respect to the creditor's *security* for the principal's performance: "Sections 2845 and 2849 of the Civil Code giv[e] a surety the benefit of all security held by the creditor for performance of the obligation and the power to require the creditor to proceed against such security . . . ." (*Brunswick Corp. v. Hays* (1971) 16 Cal.App.3d 134, 138 [93 Cal.Rptr. 635]; see also *Wiener v. Van Winkle* (1969) 273 Cal.App.2d 774, 786 [78 Cal.Rptr. 761].) Even assuming for the sake of analysis that the JPA funds were in fact true insurance rather than self-insurance, Colonial cites no case treating the creditor's own purchase of loss insurance as "security" for the performance of the principal's obligation. Such a construction is not supported by the words

---

[25] Civil Code section 2845 provides in relevant part: "A surety may require the creditor . . . to proceed against the principal, or to pursue any other remedy in the creditor's power which the surety cannot pursue, and which would lighten the surety's burden . . . ."

[26] Civil Code section 2849 states: "A surety is entitled to the benefit of every security for the performance of the principal obligation held by the creditor . . . at the time of entering into the contract of suretyship, or acquired by him afterwards . . . ."

of the statutes, or by any authority or reason Colonial calls to our attention. The creditor's loss insurance is not a remedy or security against default negotiated between principal and creditor as contemplated by sections 2845 and 2849; it is a contractual right purchased from a third party at the creditor's sole expense, wholly unrelated to the principal-creditor transaction. Colonial fails to offer a convincing reason why this court should expansively construe these sections to make sureties the beneficiaries of the creditor's foresight in purchasing insurance.

The trial court did not err in determining Colonial's rights, defenses, and liabilities.

## C. *Sterling's Appeal*

Solano cross-complained against Sterling for contribution, indemnity, and declaratory relief. The premise of the cross-complaint was that Solano and Sterling were jointly and severally liable, along with Colonial, for $252,800 of the $389,968 of the damages awarded. On that premise, Solano contended Sterling would have to satisfy the $252,800 portion of the judgment *ahead of Solano* under Insurance Code section 1063.1, subdivision (c)(9)(A) because Sterling had "other insurance" available from its solvent liability carrier, Zurich. The trial court agreed with Solano on that point, and additionally ruled Sterling must pay prejudgment interest on the $252,800 award based on its interpretation of the Guarantee Act.

Our ruling reversing the underlying damages award against Solano under Insurance Code section 1063.1 effectively moots the issues decided on Solano's cross-complaint and requires entry of a new judgment dismissing the cross-complaint. We therefore reverse the portions of the judgment addressing the issues raised by Solano's cross-complaint against Sterling, including (1) matters pertaining to the satisfaction on the $252,800 portion of the judgment for which both were found jointly and severally liable along with Colonial and (2) Sterling's liability for prejudgment interest. This does not affect Sterling's joint and several liability, along with Colonial, on the District's complaint in the amount of $252,800, nor does it affect Colonial's liability for the full judgment amount of $389,968 and prejudgment interest thereon.[27]

[27] Sterling expressed concern in its appeal that the court's ruling on the cross-complaint made it "entirely responsible for the [joint and several portion of the] damage award," to the exclusion of Colonial as well as Solano. Although there may be some ambiguity about this in the judgment as entered, it is clear from its oral decision on the cross-complaints the court intended to place Sterling and Colonial on the same footing with respect to satisfaction of the joint and several portion of the damages award. The modifications to the judgment required by our decision should eliminate any ambiguity on that score.

## III. DISPOSITION

The judgment on the District's complaint against Solano is reversed, and the judgment on Solano's cross-complaint against Sterling is vacated with directions to enter a new judgment dismissing the cross-complaint as moot. The judgment is affirmed in all other respects. The District is awarded its costs in case No. A127186. Solano is awarded its costs in case No. A127189. Each party shall bear its own costs in case No. A127244.

Marchiano, P. J., and Dondero, J., concurred.

A petition for a rehearing was denied May 25, 2011.