Filed 6/30/14  Favaloro v. Compagno CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ANTHONY FAVALORO et al., | H038968 |
| Plaintiffs and Respondents, | (Monterey County Super. Ct. No. M97790 ) |
| v. | |
| BENEDETTO JOHN COMPAGNO, | |
| Defendant and Appellant. | |

Marie and Anthony Favaloro sued Benedetto John Compagno over the loss of a $200,000 investment.  Compagno was an agent for an investment company known as Cedar Funding (Cedar), which financed home construction loans secured by trust deeds.  Relying on the advice and representations of Compagno, a trusted friend of many years, the Favaloros put $200,000 into what they understood to be a safe investment secured by a first deed of trust.  The $200,000 was lost after the property securing the investment was foreclosed upon by senior creditors.

After a two-day bench trial, the court found defendant liable on theories of negligence, negligence per se, and breach of fiduciary duty.  Compagno argues on appeal that the role he played in the Favaloros' investment was not the actual or legal cause of their injury.  For the reasons explained below, we will affirm the judgment on the theories of negligence and breach of fiduciary duty.

# I.  TRIAL COURT PROCEEDINGS

## A.  PLAINTIFFS' CASE

Marie Favaloro, born in 1960, was a lifelong resident of Monterey County with a high school education.  Her husband Anthony, 21 years her senior, immigrated to the United States in 1956 from Sicily, where he had attended school until the age of 11.  Anthony did not read English, and Marie handled the couple's financial paperwork.

Anthony met defendant Compagno in the mid-1970s, and Marie met him in 2006 when he started frequenting their business, a bakery in Pacific Grove.  Defendant admitted in his verified answer:  "Plaintiffs at all times ... had a long standing relationship with defendant Compagno, one based on honesty and trust, and [plaintiffs] placed their trust in said defendant and believed in his honesty."  Defendant was an experienced real estate investor, builder, and developer.  He had been a licensed general contractor for over 30 years and a licensed real estate salesperson for 20 years.  Defendant had owned more than 100 properties, having invested in land, single-family homes, multi-unit dwellings, condominiums and commercial properties.

Sometime between December 2006 and February 2007, defendant approached plaintiffs about Cedar, urging them to invest.  He told plaintiffs they would get a very good return on an investment and not have to work so hard.  Defendant explained that an investment would be secured by a recorded first deed of trust, and plaintiffs could get their money back whenever they wanted it.  After investing himself, defendant became a Cedar sales agent and received commissions on investments he brought in.  Plaintiffs understood and defendant acknowledged that he was plaintiffs' Cedar investment agent.

Plaintiffs were hesitant to invest, but defendant visited plaintiffs' bakery on a daily basis for several months "talking up" the Cedar investment.  Marie testified:  "He was constantly talking to me and my husband about it and making it sound like it was so perfect and that we would have this great income and [*sic*] totally safe, so he kind of convinced me.  In a way, he convinced me over time."  Defendant invested $1 million in

a Cedar loan to Accustom Development in February 2007. He showed his investment check to plaintiffs at the bakery and told Anthony "It's guaranteed." At that point Anthony told his wife "sounds good … [he's] making good interest … we trust him … [h]e's doing it."

Defendant arranged for plaintiffs to meet with David Nilsen at Cedar to assure plaintiffs that their investment would be safe. While no evidence was presented identifying Nilsen's position at Cedar, Salvatore Bruno, who worked for Cedar as a mortgage broker from 2003 to 2008, testified that Nilsen "ran the company" and made funding decisions. Nilsen told plaintiffs that he had never lost money for his clients in 35 years, that the investment was totally safe, and the worst that could happen would be that the property would have to be sold for plaintiffs to get their money back. In their brief meeting, Nilsen told plaintiffs nothing defendant had not already told them.

In June 2007, plaintiffs gave defendant a $200,000 check to invest in Cedar, and defendant filled out a Cedar investment form acknowledging receipt of plaintiffs' funds. Although defendant testified that he recommended plaintiffs invest in Sycamore Ventures, Marie claimed that she gave the check to defendant not knowing where the money was going, other than to a safe place secured by a first deed of trust. Defendant understood that plaintiffs were investing in Sycamore, an investment on which he had performed due diligence. He discussed the investment with the borrower's Cedar representative, reviewed the borrower's building plans, visited the construction site, and felt the investment was worthwhile and safe.

Defendant requested but never received a recorded trust deed for his own $1 million investment. When he asked at Cedar, he "never got any answers," and "there was always an excuse." Defendant nonetheless made two further investments with Cedar in June 2007 of $525,000 and $375,000. As of January 2008, defendant had not received security documents on any of his investments. Defendant never disclosed this

information to plaintiffs before or after making their investment.  Had plaintiffs been told this, they would not have invested with Cedar.

Although they received monthly Sycamore interest checks from June 2007 through November 2007, plaintiffs never received a trust deed for the Sycamore investment.  Sometime in December 2007 or January 2008, defendant learned that the Sycamore loan never funded.  Before contacting plaintiffs, defendant asked Nilsen to return plaintiffs' money because he knew that is what plaintiffs would want.  According to defendant, Nilsen said:  "[Y]ou can put in a demand, but I don't know when they are going to get [their money]; they're not going to get any interest until after the loan is placed," and "we just can't give it at this certain time, but they can put a demand in for their money, and the money will come to them eventually.  …  [M]eanwhile, until their money is placed into a different investment, there won't be any interest."  Defendant phoned plaintiffs and, as Marie recalled, "[h]e said something like things were coming down and that he needed to move my money in a more secure place."  Defendant did not tell plaintiffs that the Sycamore loan did not fund.  Nor, when she asked for their money back, did defendant tell her that she could place a demand for the money.  Instead, he told her "I can't do that.  We can't give your money back.  You can't just walk into a bank and ask for $200,000."  Marie called defendant several times demanding her money.  Defendant responded:  "I can't.  I can't.  Trust me.  I'm going to move it to a secure place."

Marie testified that plaintiffs did not hear anything for a long time after that phone conversation.  At some point defendant returned to the bakery with a Cedar investment form for Marie to fill out.  Following defendant's instructions, Marie completed the form, directing plaintiffs' $200,000 "into Mills – SFR, Lot Monterra, Monterey" and interest payments into Cedar's general fund.  Marie did not specifically instruct defendant to put plaintiffs' money into Monterra:  "Mr. Compagno made the decision of moving what he said was [to] a secure place."  Marie understood that plaintiffs' $200,000 investment

would still be in a first deed of trust. Defendant never gave Marie a list of possible investments. Marie never told defendant she researched the Monterra investment, and she filled out the investment form not knowing what Mills or SFR were.

When she asked defendant about the security documents for Monterra, defendant told her not to worry and to trust him. Defendant performed no due diligence on the Monterra investment. At some point after he moved plaintiffs' money, defendant took Anthony to the Monterra property. Marie also visited the property with her husband.

After defendant told Marie that she and Anthony could earn more money by reinvesting their monthly interest in a Cedar general fund, Marie authorized the reinvestment in writing. When presented with defendant's Exhibit D, a photocopy of Marie's handwritten request below a Cedar computer-generated printout identifying the Favaloro investment in Monterra, Marie testified that she recognized only the handwritten portion of the document, which read "[p]lease roll my interest check every month in the general fund and please send me verification." She wrote the undated request on a blank piece of paper from her printer and handed it to defendant at the bakery. Confronted with her deposition testimony that she rolled her interest into Cedar's general fund by "writ[ing] something and fax[ing] it over to the office," Marie testified that she clearly recalled handing Exhibit D to defendant.

Marie testified that plaintiffs received interest payments on their investment after visiting Monterra, and Cedar records show interest paid through February 2008. When interest payments stopped, Marie visited Cedar's office seeking any paperwork on her investment. She received a disclosure statement and a Cedar investment overview sheet showing a $1.5 million Cedar loan to Monterra on September 24, 2007 secured by a second deed of trust. Both documents showed the Monterra property appraised at $6.7 million with a first loan encumbrance of $1.875 million. She also received an unrecorded deed of trust assignment and a note endorsement assigning plaintiffs'

13.3 percent interest in the Monterra note. The disclosure, assignment, and note endorsement, dated January 24, 2008, appeared to be signed by Nilsen.

Defendant never provided plaintiffs with any recorded trust deeds for the Monterra investment. A certified copy of a first deed of trust on the Monterra property, recorded October 4, 2007, showed a $4.875 million security interest, not a $1.8 million encumbrance as shown in the documents Marie obtained from Cedar. Cedar held a second deed of trust for $1.5 million also recorded October 4, 2007. In an April 21, 2008 recorded assignment, Cedar assigned its $1.5 million Monterra deed of trust to nine investors including plaintiffs.

Cedar filed for bankruptcy and plaintiffs eventually learned that the Monterra property was foreclosed upon by the first trust deed investors to recover over $5 million in arrears. The property sold in April 2010 for $3.5 million, eliminating any security interest held by plaintiffs.

**B.    DEFENDANT'S CASE**

Defendant told plaintiffs he had "very little experience" with Cedar. He arranged a meeting with plaintiffs for Nilsen to explain his company, including the types of investments and risks, and to give plaintiffs a list of investments to select from. Between February and June 2007 defendant was not concerned that he had not received a deed of trust for his $1 million investment because seasoned Cedar agents told him not to worry, that they would get the deeds out sooner or later. Defendant never told plaintiffs that a Cedar investment was risk free. From their meeting with Nilsen, plaintiffs knew that any investment would be secured by the value of the property.

In January 2008, after learning that the Sycamore loan never funded, defendant advised plaintiffs to make a withdrawal demand, even though they would not get their money back immediately. Defendant himself withdrew over $300,000 of his investment in this way. Plaintiffs elected not to do so. As their Cedar agent, defendant provided plaintiffs with a list of available investments. Monterra was on that list, and it was not

secured by a first deed of trust.  Although Monterra looked remotely interesting, nothing on the list appealed to defendant, and defendant told plaintiffs that due diligence would need to be done on any investment.

Defendant never recommended Monterra to plaintiffs, and he was not involved with moving plaintiffs' money to that investment.  Defendant first learned of plaintiffs' Monterra investment when Cedar staff showed him Exhibit D.  He did not know how that document was created.  After discovering Exhibit D, defendant then went through plaintiffs' file and found the Monterra investment form.  Defendant never directed Marie to fill out that form, and he was shocked to learn of the investment.  Defendant explained: "I realized that somebody else had put them into this investment, or she [Marie] put herself into it."

Defendant contacted plaintiffs after discovering the Monterra investment.  Marie told him she had researched Monterra and felt the company was strong and reputable. Defendant told plaintiffs that more due diligence should have been done and he should have been involved in the investment decision.  Still, plaintiffs seemed happy with the investment after defendant took them to Monterra for a site visit.

Having the same experience Marie was having—his questions and requests were not being answered and there was always an excuse—defendant no longer felt comfortable at Cedar and left the company's service in March 2008.  Before leaving, he submitted three investor withdrawal request forms on plaintiffs' behalf.  The first form, with a "request received" date of January 1, 2008, sought $200,000 "from Sycamore to be relocated to new investment.  To Mills – SFR, Monterra Monterey."  The second written request sought $200,000 from the Monterra investment.  The third form requested the "total amount invested" from Cedar's general fund.  Those forms were among several defendant completed on behalf of all his clients before his departure.

## C.    TRIAL COURT'S RULING

The trial court found that defendant twice misrepresented to plaintiffs that their $200,000 investment would adequately be secured by a first deed of trust, that these misrepresentations were a substantial factor in causing plaintiffs' harm, and that defendant's actions constituted negligence, negligence per se under Business and Professions Code section 10234, and breach of fiduciary duty.

The court found defendant failed to inform plaintiffs that he never received a trust deed securing his February 2007 investment. Based on his real estate experience and his repeated efforts to obtain that deed of trust, defendant knew or should have known that a trust deed securing his investment did not exist. The court credited plaintiffs' testimony that they invested because they relied on defendant's representation that their investment would be secured by a first deed of trust, and that they would not have invested had they known defendant had not received a trust deed on his own investment.

The court further found:  (1) Defendant directed plaintiffs' $200,000 investment into the Monterra loan, leading plaintiffs to believe that loan was secured by a first deed of trust; (2) defendant failed to perform due diligence on the Monterra investment, which would have disclosed insufficient equity to secure the loan; (3) plaintiffs lost their investment when the property was foreclosed upon; (4) defendant told plaintiffs their Monterra investment would be secure without disclosing any contrary information; and (5) defendant's omissions and misrepresentations regarding the Monterra loan were substantial and constituted negligence. The court found that defendant was plaintiffs' agent and, as plaintiffs' agent, defendant had the duty to investigate and provide information to plaintiffs.

The court ordered judgment in favor of plaintiffs for $200,000 plus prejudgment interest from April 1, 2008.

## II. DISCUSSION

### A. CAUSE-IN-FACT

Defendant argues that his actions were not the cause-in-fact of plaintiffs' injury for two reasons. First, defendant contends that the trial court erred by finding him liable based on representations he made to plaintiffs preceding their June 2007 investment because he was merely restating representations of his principal, David Nilsen. Defendant relies on *Seckel v. Allen* (1944) 67 Cal.App.2d 146, 150, where the court concluded that a seller's real estate agent was not liable in fraud for conveying to the purchaser an alleged misrepresentation made by the seller regarding the property value. The agent was not liable because there was no evidence that the agent made the alleged statement knowing it to be untrue or without any basis to believe that it was true. (*Ibid*.) But *Seckel* involved a cause of action for fraud. Here, the court found defendant liable for negligence. Plaintiffs did not need to show that defendant lacked any basis to believe his statements to be untrue, but merely that defendant breached a duty of due care in his dealings with them. (*Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 917 [stating negligence elements].)

Defendant's reliance on *Robinson v. Grossman* (1997) 57 Cal.App.4th 634, a case examining the scope of a real estate salesperson's duty under Civil Code section 2079, also is misplaced. Civil Code section 2079 imposes an inspection and disclosure duty on real estate salespersons representing sellers of residential dwellings. Defendant was not representing residential property sellers. Rather, he was recruiting investors to fund Cedar's construction loans.

Defendant's agency relationship with Nilsen did not circumscribe the duty of care he owed to plaintiffs. Regardless of defendant's employment relationship with Nilsen, the trial court found that defendant was *plaintiffs'* agent, and as plaintiffs' agent, defendant had the fiduciary duty to investigate and disclose pertinent details of plaintiffs' investment, particularly the nature of the investment's security. Defendant admitted that

plaintiffs had placed their trust and confidence in him. Knowing this, defendant pursued plaintiffs for several months, assuring them that a Cedar investment was safe, secure, and guaranteed by a first deed of trust. Further, defendant admitted that he was plaintiffs' agent, and he acknowledged his role to perform due diligence on his clients' investments.

The trial court found defendant liable based on his own misrepresentations and omissions, not for restating any misrepresentations made by his principal. The trial court found that defendant personally knew recorded trust deeds were not forthcoming for Cedar investors since he himself was an investor and receive no recorded security instruments for his investments. Although defendant testified he told plaintiffs he was inexperienced and directed plaintiffs to Nilsen to explain Cedar investments, substantial evidence in the record demonstrates that defendant was a knowledgeable real estate investor who made personal representations to plaintiffs regarding any prospective investment with Cedar. Defendant had invested in over 100 properties since the early 1970s, most of which were bank financed and secured by trust deeds. Defendant was a licensed real estate agent for over 30 years, who knew the difference between the different types of Cedar investments, including first trust deeds, second trust deeds, and a general fund investment. Defendant testified that, after giving Cedar about 30 days to prepare the paperwork for his investment, he repeatedly asked if a deed of trust had been prepared, and instead of answers, he received only excuses. Even if defendant was assured by his Cedar colleagues that delays were normal and a deed of trust would be prepared eventually, as defendant insists he reasonably believed, that only impresses that he knew or should have known that a deed of trust did not exist at the time he was urging plaintiffs to invest in Cedar.

Defendant contends he can be liable for his principal's representation regarding the security for plaintiffs' investment only if he knew or should have known that the representation was untrue. But again, the trial court did not find defendant liable for restating misrepresentations of his principal. Defendant had an independent duty of care

to plaintiffs as their agent and advisor, regardless of any relationship between him and Nilsen, and he was found liable based on his breach of that duty. (*Wolf v. Superior Court* (2003) 107 Cal.App.4th 25, 29 [describing fiduciary relationship as arising where a "confidence is reposed by one person in the integrity of another" who accepts the confidence].)

Defendant also argues that the trial court erred in finding him liable for his independent failure to disclose to plaintiffs that he had not received a deed of trust securing his February 2007 investment because that omission fails the cause-in-fact, or "but for" test, contained in CACI No. 430. That jury instruction frames the cause-in-fact inquiry as whether defendant's conduct was a "substantial factor" in causing plaintiffs' harm: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. [Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct.]" (CACI No. 430.) According to defendant, the bracketed provision of the jury instruction is key. Defendant presses that his failure to disclose is not a substantial cause of plaintiffs' loss because Nilsen stole plaintiffs' money.

As plaintiffs point out, no evidence was presented at trial that Nilsen stole their investment, or that their investment was lost in January 2008. Although defendant did not know where plaintiffs' money was after learning that the Sycamore loan did not fund, documents in evidence trace plaintiffs' money to the Monterra loan. But even if foul play by Nilsen contributed to plaintiffs' loss, defendant's conduct was still a cause-in-fact. Under CACI No. 430, conduct is not a substantial factor in causing plaintiffs' injury, and thus not a cause-in-fact, only if the harm would have occurred anyway. The court found plaintiffs would not have invested had defendant told them he never received a deed of trust for his $1 million investment. If the investment would not have happened, then the loss would not have happened. Substantial evidence supports the court's finding:

Plaintiffs testified that they would not have invested had they been told that defendant had not received a deed of trust, and the trial court found that testimony credible.

Defendant claims the trial court "assumed that 'but for' [his] failure to advise [plaintiffs] that he had not received *any* documentation for this loan, [plaintiffs] would not have invested in the first place," and that "no evidence … support[s] a conclusion that had [he] informed [plaintiffs] of all that he knew, … [plaintiffs] would never have invested." But the court's finding is based on the evidence presented at trial. It assumed nothing. The absence of evidence supporting an alternative hypothetical does not undermine the evidence supporting the trial court's finding. Nor does it establish that defendant's conduct was not a substantial factor in causing plaintiffs' injury.

### B.  SUPERSEDING CAUSE

Defendant asserts that his conduct was not the legal cause of plaintiffs' investment loss because of the intervening theft of plaintiffs' funds by Nilsen. Defendant cites CACI Nos. 432 and 433, jury instructions recognizing as an affirmative defense to negligence that third-party conduct may be a superseding cause of a plaintiff's harm. To avoid liability based on the superseding conduct of a third party generally, defendant would have to prove (1) that Nilsen's conduct occurred after the conduct of defendant; (2) that a reasonable person would consider Nilsen's conduct as a highly unusual or an extraordinary response to the situation; (3) that defendant did not know and had no reason to expect that Nilsen would act in a negligent or wrongful manner; and (4) that the kind of harm resulting from Nilsen's conduct was different from the kind of harm that could have been reasonably expected from defendant's conduct. (CACI No. 432.) To the extent the superseding conduct is alleged to have been an intentional tort or criminal act, defendant would have to prove only that Nilsen's act occurred after his own and that he neither knew nor could have reasonably foreseen that Nilsen would commit such an act by taking advantage of the situation defendant created. (CACI No. 433.)

Defendant did not advance theft by Nilsen as an affirmative defense in the trial court. He failed to plead Nilsen's conduct as an affirmative defense or argue it at the close of the evidence. Rather, defendant argued in closing that the Monterra loan funded and plaintiffs lost their investment in the Monterra foreclosure. Defendant pressed that he should not be liable for the builder's failure to sell the home and pay off Cedar's investor loan. Because defendant waived any superseding conduct of Nilsen as an affirmative defense by not raising the defense below, he cannot advance it for the first time on appeal. (*Fort Bragg Unified School Dist. v. Colonial American Casualty & Surety Co.* (2011) 194 Cal.App.4th 891, 907.)

Defendant's argument also fails on its merits. As we have already noted, there is no evidence in the record that Nilsen stole plaintiffs' investment. The record shows that Cedar filed for bankruptcy sometime after March 2008, but there is no evidence that the bankruptcy was triggered by theft or that plaintiffs lost their investment because of the bankruptcy. Defendant points to the trial court's reference to a Ponzi scheme. But the trial court's general conclusion does not undermine its more specific findings regarding the transfer of plaintiffs' funds to the Monterra loan, which are supported by substantial evidence. The record shows that plaintiffs held a $200,000 interest in a second deed of trust on the Monterra property, that the holder of the first trust deed on that property exercised its right to foreclose to recover over $5 million in arrears, and that the property sold in April 2010 for $3.5 million, wiping out plaintiffs' security interest in the property and thus their investment.

The Monterra foreclosure is also not a superseding cause of plaintiffs' loss. To avoid responsibility under this theory, defendant would have to show that the loss through foreclosure was highly unusual, "producing harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible." (*Soule v. General Motors Corp*. (1994) 8 Cal.4th 548, 573, fn. 9.) With his extensive real estate experience, defendant was fully aware of the risks involved

in funding construction loans, including the greater risk of investing in loans secured by second trust deeds and heavily encumbered property such as Monterra. He has failed to show that the borrower's default or the foreclosure were highly unusual or that the resulting harm—plaintiffs' investment loss—was any different from the harm which would be expected under these circumstances.

### C.      NEGLIGENCE PER SE

Defendant argues in his reply brief that he cannot be liable for negligence per se based on noncompliance with Business and Professional Code section 10234. We agree. Subdivision (a) of section 10234 requires a "real estate licensee who negotiates a loan secured by a trust deed on real property [to] cause the trust deed to be recorded … ." Although defendant was a licensed real estate agent during the relevant time period, there is no showing in the record that he negotiated either the Sycamore loan or the Monterra loan. Therefore, negligence per se is not established under Business and Professions Code section 10234, subdivision (a).

Business and Professions Code section 10234, subdivision (c) requires a real estate licensee "who sells, exchanges, or negotiates the sale or exchange of a … promissory note secured by a trust deed on real property [to] cause a proper assignment of the … trust deed to be executed and … recorded … within 10 working days after the licensee … receives any funds from the buyer … ." It is undisputed that the Monterra deed assignment was not recorded within 10 days after plaintiffs' money was moved to the Monterra investment. But liability based on negligence per se also requires a showing that the statutory violation was the proximate cause of plaintiffs' injury. (*Satterlee v. Orange Glenn School Dist.* (1947) 29 Cal.2d 581, 588 [statutory violation must proximately cause injury], overruled on other grounds in *Alarid v. Vanier* (1958) 50 Cal.2d 617, 624; Evid. Code, § 669 [presumption of failure to exercise due care requires statutory violation and injury].) The trial court made no finding that defendant's failure to have the Monterra assignment timely recorded caused plaintiffs' injury, and we

have found no facts in the record to support such a finding. Without more, the record does not establish liability under Business and Professions Code section 10234, subdivision (c).

### III. DISPOSITION

The judgment is affirmed.

_____

Grover, J.

**WE CONCUR:**


_____

Bamattre-Manoukian, Acting P.J.


_____

Mihara, J.